IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2023

## DARIUN BAILEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-02737        Jennifer J. Mitchell, Judge

_____

## No. W2023-00809-CCA-R3-PC
_____

A Shelby County jury convicted the Petitioner, Dariun Bailey, of second-degree murder, aggravated assault, and reckless endangerment, and the trial court sentenced him to twenty-two years of incarceration. *State v. Bailey*, No. W2015-00542-CCA-R3-CD, 2016 WL 3645141, at *1 (Tenn. Crim. App. June 29, 2016), *perm. app. denied* (Tenn. Oct. 20, 2016). This Court affirmed his convictions on appeal. The Petitioner filed a timely petition for post-conviction relief in which he alleged, as relevant to this appeal, that his trial counsel: failed to adequately review and inspect discovery, coerced the Petitioner into testifying, and failed to adequately meet with the Petitioner to review the evidence and prepare him for trial. The post-conviction court dismissed the petition after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and MATTHEW J. WILSON, JJ., joined.

Rosalind E. Brown, Memphis, Tennessee, for the appellant, Dariun Bailey.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Vicki Carriker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from the Petitioner shooting and killing his girlfriend's brother. In our opinion addressing the Petitioner's direct appeal, we summarized the State's proof as presented at trial as follows:

In February of 2013 Donnesha Adams was living at the Cedarwood Apartments with [the Petitioner], who was her long-time boyfriend, and their two-month-old daughter, M.A. . . . Ms. Adams testified that she and [the Petitioner] lived in the apartment together "[o]n and off." On February 20, 2013, Ms. Adams left the apartment at approximately 1:45 p.m. with [the Petitioner] and M.A. to go to work. She planned to drive [the Petitioner] to his grandmother's house on Merryville Street, and she was going to drive M.A. to Ms. Adams'[s] mother's house so that her mother, Djana Bailey, could babysit.

When Ms. Adams arrived at [the Petitioner]'s grandmother's house, she and [the Petitioner] had already been arguing in the car. Ms. Adams pulled up in front of the residence, and [the Petitioner] told her that she could not leave. He then removed her keys from the ignition and threw them in the street. [The Petitioner] eventually picked the keys up and placed them back in the ignition; however, he continued to tell Ms. Adams that she could not leave. She and [the Petitioner] continued arguing, and [the Petitioner] said that he wanted to keep M.A. with him for the day at the Merryville residence. Ms. Adams refused because the child did not have any of her supplies there. Everything was at Ms. Bailey's home. Ms. Adams and [the Petitioner] began tussling in the car over M.A.'s infant carrier. [The Petitioner] managed to get the child out of the car, and he took her into the house. He walked back outside and told Ms. Adams to go to work. Ms. Adams then refused to leave without her daughter. By then, Ms. Bailey had called several times. [The Petitioner] answered Ms. Adams'[s] phone and told Ms. Bailey that Ms. Adams was on her way there. Ms. Adams also briefly spoke with Ms. Bailey and told her that [the Petitioner] had taken the child into the house. [The Petitioner] eventually brought M.A. back outside and strapped her back inside the car. Ms. Adams then attempted to leave but she and [the Petitioner] began arguing again over money.

Ms. Adams testified that [the Petitioner] pulled a black and silver gun from his pants and pointed it at her. She was "terrified." Ms. Adams then saw a red car drive up, and her brother, Antonio Adams, stepped out of the vehicle. [The Petitioner] thought that Ms. Adams had called her brother to the address, and he said, "[S]o that's how ya'll going to do it." [The Petitioner] and Mr. Adams, the victim, began fighting in the street, and Ms. Adams heard a gunshot. The victim "limped round" to the back of her car and got in on the passenger side. He did not tell Ms. Adams that he had been shot, and he said, "[L]et's go." She saw [the Petitioner] "dart" inside the house. As Ms. Adams attempted to restart her car after the engine stopped, [the Petitioner] walked up and shot out the passenger-side window of the

vehicle where the victim was sitting. Ms. Adams was not sure how many times [the Petitioner] fired the weapon. She said that the gun [the Petitioner] used the second time was completely black. Ms. Adams testified that [the Petitioner] walked around the front of her car to the driver's side and told her to "move." Ms. Adams ducked, and [the Petitioner] shot the victim several more times. M.A. was in the back seat of the car during the shooting. [The Petitioner] then "ran off [ ] in the yard." The victim said that he was dying and told Ms. Adams to go. Ms. Adams drove the victim to Methodist North Hospital. She said that as she drove, the victim kept falling over and knocking her car out of gear. She had to hold the victim with her shoulder and drive at the same time. They arrived at the hospital within five to seven minutes. The victim later died as a result of his wounds. Ms. Adams testified that she never saw the victim with a gun prior to the shooting.

Kenetria Young, the victim's girlfriend, testified that on February 20, 2013, Ms. Bailey, the victim's mother, called the victim and asked him to check on Ms. Adams because she was worried about Ms. Adams. Ms. Young and the victim picked up her son from school and then drove to Merryville Street. Ms. Young's other child was also in the car at the time. Ms. Young testified that they pulled up and saw Ms. Adams'[s] car parked on the side of the street. Ms. Adams was sitting inside the car, and [the Petitioner] was standing to the side of the vehicle. Ms. Young parked her car, and the victim got out and closed the door. The victim walked toward [the Petitioner], and the two men began "fist fighting." Eventually both men fell to the ground and were hitting each other. At that point, Ms. Young did not see a gun. Ms. Young testified that [the Petitioner] got up and ran into the house, and the victim got up and got into the car with Ms. Adams. Ms. Young said that [the Petitioner] walked back out of the house, stopped "middle ways of the yard," and he fired what Ms. Young thought was two or three shots. [The Petitioner] then walked to the car and kicked the window. Ms. Young testified that [the Petitioner] "ran around the front of the car to the driver's side. He opened the door[,] and he started firing shots." After that, [the Petitioner] ran back into the yard, and Ms. Adams drove away. Ms. Young called 911, and the operator instructed her to go to the hospital. [The Petitioner] remained standing in the yard.

Officer Kyle Craig of the Memphis Police Department testified that he responded to Methodist North Hospital on February 20, 2013. As he arrived, Ms. Adams drove up with the victim. Officer Craig spoke with Ms. Adams who was hysterical and worried about the victim. She told Officer Craig that "my boyfriend shot my brother." Officer Craig also saw a baby in the backseat of Ms. Adams'[s] car. He secured the vehicle until the crime scene unit arrived at the hospital.

3

Officer Michael Spearman, a crime scene investigation (CSI) officer, collected four nine[-] millimeter shell casings from the scene on Merryville Street. From there Officer Spearman drove to Methodist North Hospital and collected a bullet fragment taken from the victim and the victim's clothing. He also photographed Ms. Adams'[s] car. Officer Spearman later returned to the Merryville address to assist in executing a search warrant. He collected a nine[-]millimeter black High Point pistol located in the master bedroom inside of a black gun box. Officer Spearman also found a .32 caliber revolver in a shoe box under the couch in the "den area." Officer Hope Smith, also a CSI officer, testified that she processed Ms. Adams'[s] car and located four bullet fragments in the car.

Special Agent Eric Warren, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Laboratory, Firearms Unit, testified that he examined two firearms (a High Point Model C9 pistol and a revolver), eight "live" rounds or cartridges, five bullet fragments, and four cartridge cases recovered in the present case. Special Agent Warren determined that the four cartridge cases were fired from the same weapon but not from the High Point Model C9 that he examined. He noted that the revolver was damaged and incapable of being fired. Special Agent Warren determined that four of the bullet fragments had characteristics of being fired from a High Point firearm. Due to the condition of the bullet fragments, Special Agent Warren could not say for certain that the bullets were fired from the High Point weapon that he examined. He also could not say for certain how many bullets were represented among the four fragments. Special Agent Warren testified that the fifth bullet fragment, recovered from the hospital, was larger than the other four. He determined that it and one of the other four fragments were fired from the same weapon.

Dr. Erica Curry performed an autopsy on the victim. She testified that the victim had a gunshot wound to the left side of his chest and four wounds to his right forearm. "Three of them were entrance wounds and one was an exit wound." The victim also had "two entrance gunshot wounds to his right thigh." Dr. Curry testified that she recovered five bullets and one fragment from the victim's body. There were abrasions, scratches, and bruises to various areas of the victim's body that "could be consistent" with being in a fist fight. Dr. Curry testified that the victim's body showed signs of "pseudo stippling" which meant that "a bullet travels through [an] intermediary target either on or another object before it actually hits the body." She agreed that the "pseudo stippling" could have been caused by the bullet striking a window. Dr. Curry noted that the victim's toxicology report was positive "for the metabolites of marijuana." She testified that the cause of the victim's

4

death was multiple gunshots wounds, and the manner of death was homicide. Dr. Curry opined that the fatal wound was the one to the victim's chest.

*Bailey*, 2016 WL 3645141, at *1-3. The Petitioner also offered proof that the Petitioner appeared in "shock" after the initial shooting and that, shortly after the shooting, the Petitioner stated that the victim was trying to kill him. The Petitioner's witnesses said that, after the first shooting, the victim appeared to be wrapping a gun in a white shirt and that the Petitioner then grabbed a gun from the grass and shot the victim again. The Petitioner testified on his own behalf and stated that the victim attacked him and was shot by the victim's own weapon during the altercation. The Petitioner said that he went inside, grabbed a gun, went back outside, and shot the victim at least six times, some of which were while the victim was seated in Ms. Adams's car while M.A. and Ms. Adams were both in the car. The Petitioner testified that he disposed of his weapon in the river after the shooting.

Based upon this evidence, the jury convicted the Petitioner of second-degree murder of Mr. Adams, aggravated assault of Ms. Adams, and reckless endangerment of M.A., and the trial court sentenced him to twenty-two years of incarceration.

## B. Post-Conviction

The Petitioner filed a timely petition for post-conviction relief. In it, he alleged that his trial counsel ("Counsel") was ineffective because Counsel: failed to adequately review and inspect discovery, coerced the Petitioner into testifying, and failed to adequately meet with the Petitioner to review the evidence and prepare him for trial. The post-conviction court held a hearing on the petition, during which the parties presented the following evidence:

The Petitioner testified that his first counsel, who was appointed, never provided him with any information including anything regarding discovery. His first counsel informed him that, if he went to trial, he would receive fifty-one years of incarceration. The Petitioner recalled that, in July 2014, his family combined funds to hire an attorney, Counsel. Between July 2014 and the Petitioner's trial in January 2015, he met with Counsel once in person. At that meeting, which occurred one month before his trial, Counsel did not review the discovery file or discuss a defense with him and just told him that he was set for trial. The Petitioner said he never got a chance to prepare his defense. Later, the Petitioner testified that, at his meeting with Counsel, the Petitioner had his discovery packet with him, but Counsel did not explain the trial process to him.

The Petitioner said he was unaware how Counsel developed the witnesses that testified on his behalf. He did not know that his brother was going to testify on his behalf. The Petitioner said he never received any copies of witness statements and never discussed with Counsel whether he planned to testify.

5

The Petitioner testified that, during trial, he learned that law enforcement had performed a gun powder residue test on the victim. The Petitioner testified that, the medical examiner who testified at trial said that the test came back positive, meaning that the victim had gun powder residue on his hands. [1] The Petitioner said that the medical examiner said that she gave the "results" to the State but that she did not see them again. The Petitioner said his trial would have resulted differently had he known about the test results before trial. He said Counsel should have known of these results and should have better prepared a self-defense claim.

During cross-examination, the Petitioner testified that his first counsel represented him for approximately one year and that the two never discussed his case. The Petitioner agreed that Counsel presented witnesses to support the Petitioner's claim of self-defense and that the Petitioner also testified on his own behalf regarding his self-defense claim. He also conceded that he was convicted of a lesser-included offense than charged, having been charged with first-degree murder and convicted of second-degree murder.

The Petitioner agreed that the medical examiner testified at trial that the victim had shot a weapon the day of this incident, which helped the Petitioner's case. Counsel then cross-examined the doctor. The Petitioner agreed that Counsel filed a motion for new trial and an appeal alleging that the State had wrongfully withheld the gunshot residue tests based on *Brady v. Maryland*. The Court of Criminal Appeals did not grant him relief on this issue.

Counsel testified that he was sure he would have visited the Petitioner in jail after the Petitioner's family retained him. Counsel said that he reviewed the discovery that the State had provided, and, because it did not contain a report for gunshot residue, he assumed that there was not one. He agreed that he did not have the swabs tested until after the trial.

---

[1] The facts of the case presented differ from the Petitioner's testimony. The medical examiner in this case testified that she took swabs of the victim's hands, but that testing would not definitively show whether he fired a weapon. The State provided the defense an autopsy report that showed that the swabs had been taken. Counsel never asked for the swabs before trial. We concluded first that the evidence had not been withheld and second that the evidence was not material. We stated:

> Moreover, [the Petitioner] has not shown that the evidence was material. [The Petitioner] admitted at trial that he was no longer threatened by the victim when he went inside the house, retrieved a gun, and walked back outside and shot the victim numerous times while the victim was seated in a car with the door shut and was presumably trying to leave the scene. As found by the trial court, even if the victim had fired a weapon earlier in the altercation, self-defense was no longer necessary when [the Petitioner] shot the victim. There was no testimony that the victim had a gun after he got into the car with Ms. Adams.

*Bailey*, 2016 WL 3645141, at *6.

6

He said that he "totally missed" that they existed in the autopsy report. The judge, he said, allowed him to argue during closing argument that the State had not proven their case because they did not offer the results of those swabs.

Counsel said that he did not hire a private investigator. He said that, by the time he was hired, the trial date had been set, so Counsel had to rely on the public defender's investigation.

Counsel said that the major problem in this case was that the fight between the Petitioner and the victim had ceased when the Petitioner went into the apartments and retrieved a gun. The Petitioner came back out and started shooting. Further, two witnesses testified that the victim did not have a gun, and no gun was found at the scene.

During cross-examination, Counsel testified that he had practiced law for almost fifty-five years and specialized in criminal defense. He said that he filed a motion in limine in this case to exclude drugs and other evidence found at the Petitioner's house that had nothing to do with this case.

Counsel was certain that he met with the Petitioner and his family and said he did not think he needed a continuance in this case. He said that he cross-examined the medical examiner about the fact that neither she nor the State tested the gunshot residue swabs. He also argued the lack of testing during his closing argument. Counsel testified that, in the case, the Petitioner shot the victim outside the car and then also while the victim was inside the car, with the car door closed, while his girlfriend and child were in the car. The four shell casings found at the scene were all fired from the same weapon.

Counsel said he presented evidence to the jury showing that the victim was the initial aggressor.

The Petitioner then asked to withdraw his petition. The post-conviction court discussed with him that, if his petition was successful, the State could pursue charges of first-degree murder against him, as that was the initial indictment. The Petitioner said that he did not want to gamble and wanted to withdraw his petition.

The post-conviction court granted his motion to withdraw his petition on June 10, 2022. On June 23, 2022, the post-conviction court without explanation reinstated his petition. On May 5, 2023, the post-conviction court denied the Petitioner's petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner contends that Counsel was ineffective because: (1) he failed to review and inspect discovery because he failed to notice that the State had taken

7

but not independently tested gunshot residue swabs; (2) coerced the Petitioner to testify; and (3) failed to adequately prepare him for trial. The State counters that the Petitioner did not prove these claims, and we agree.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that

counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). Under the two-prong test enunciated by *Strickland*, and adopted by our Tennessee courts, a petitioner must show that counsel made errors that were so serious that counsel was not functioning as "counsel" as guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense so that he was denied a fair trial. The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Discovery

The Petitioner contends that Counsel was ineffective because he did not notice that the State had taken, but not tested, gunshot residue swabs from the victim's hands. The post-conviction court found that the Petitioner had not offered proof at the hearing about

what the test results of the swabs would have shown and noted that the results could have shown that the victim did not have gunshot residue on his hands. The post-conviction court further noted that there was overwhelming proof that the Petitioner shot the victim once and the gun malfunctioned. The Petitioner then went inside his grandmother's house, retrieved another weapon, came back out and shot the victim again at close range. The post-conviction court concluded that the Petitioner had failed to prove prejudice. We agree.

The Petitioner did not present any evidence at the post-conviction hearing to show what testing of the gunshot residue swabs would have shown. "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). By failing to produce a gunshot residue test result at the hearing, the Petitioner has failed to present evidence to meet the burden required of him. *See Lewis v. State*, No. W2020-00653-CCA-R3-PC, 2021 WL 3140352, at *6 (Tenn. Crim. App. Apr. 27, 2021) (holding that "[b]y failing to show how ballistics tests or expert testimony would have changed the outcome of the trial, [the p]etitioner has failed to prove this allegation of ineffective assistance of counsel by clear and convincing evidence."), *no perm. app. filed; Roberson v. State*, No. E2020-00643-CCA-R3-PC, 2021 WL 2373819, at *15 (Tenn. Crim. App. Mar. 31, 2021) (concluding that the petitioner was not entitled to post-conviction relief because the petitioner did not present any evidence at the post-conviction hearing that further DNA or lubricant testing would have changed the outcome of the case, and we cannot grant relief based on speculation.") (citing *Moffitt v. State*, No. W2016-02487-CCA-R3-PC, 2017 WL 4124166, at *7 (Tenn. Crim. App. Sept. 18, 2017) (stating that, because the petitioner "did not offer any DNA testing[,] there is no proof that any of this evidence would have aided the [p]etitioner's defense"), *perm. app. denied* (Tenn. Jan. 22, 2018)). Accordingly, because any results of the gunshot residue tests are speculative, the Petitioner cannot show that he was prejudiced by Counsel's failure to notice that gunshot residue swabs had been taken, but not tested by the State. The Petitioner is not entitled to relief on this issue.

### B. Petitioner's Testimony

The Petitioner next contends that Counsel was ineffective because he coerced the Petitioner into testifying, which harmed the Petitioner's case as the Petitioner felt unprepared. The post-conviction court noted that the decision of whether to testify was left to the Petitioner and that, while he may have felt unprepared, he chose to testify. It concluded that the Petitioner had not proven that Counsel was deficient in this regard, and we agree.

The evidence presented at the post-conviction hearing does not preponderate against the post-conviction court's finding. Counsel met with the Petitioner before trial, and the two were both operating from a self-defense strategy. The Petitioner said that he had a

10

copy of the State's discovery packet at that meeting. The Petitioner did not present any evidence to support his claim that Counsel "coerced" him into testifying, and the post-conviction court found that the Petitioner chose of his own free will to testify. The Petitioner offered his perspective in support of the self-defense theory, and Counsel called witnesses to support that defense. The Petitioner has not offered proof that he was coerced into testifying or that Counsel was deficient in this regard. He is not entitled to relief on this issue.

### C. Failure to Meet and Prepare for Trial

Finally, the Petitioner contends that Counsel was ineffective because he did not adequately meet with the Petitioner before trial to review the evidence or prepare the Petitioner for trial. The post-conviction court found that the Petitioner had not proven his claim by clear and convincing evidence. We agree.

The Petitioner testified at trial that Counsel only met with him once before trial. Jail records indicate that Counsel met with the Petitioner on at least two occasions, December 14, and December 30, 2014, which was shortly before the January 2015 trial. The Petitioner said he never received discovery, and then later testified that he had discovery with him during the one and only meeting he had with Counsel.

We conclude that Counsel and the Petitioner both were aware that the Petitioner was asserting self-defense at trial. Counsel and the Petitioner, who at trial testified on his own behalf, presented this claim through the Petitioner and other witnesses. The Petitioner was convicted of a lesser-included offense. The Petitioner has offered no evidence as to how meeting more frequently with Counsel would have aided his defense. We conclude that the post-conviction court did not err when it denied relief on this claim. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE